UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHESTER LEE KEMPF,<br><br>Defendant. | 4:18-CR-40067-KES<br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Chester Lee Kempf is before the court on an indictment charging him with being a felon in possession of a firearm and with possessing an unregistered firearm (a silencer).[1]  See Docket No. 1.  Mr. Kempf has filed a motion to suppress certain evidence.  See Docket No. 27.  The United States ("government") resists the motion.  See Docket No. 29.  This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the

---

[1] Mr. Kempf is also charged in a separate criminal case with passing counterfeit $100 bills on August 17, November 7, and November 15 of 2017.  See United States v. Kempf, CR 18-40085, Docket No. 1, Counts 4-6 (D.S.D.).  The current motion to suppress does not implicate the charges in CR 18-40085.  In this case, the firearms offenses are alleged to have occurred on December 9, 2017.  See Docket No. 1.

October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

An evidentiary hearing was held on August 29, 2018.  Mr. Kempf was present in person along with his lawyer, Assistant Federal Public Defender Amanda Kippley.  The government was represented by its Assistant United States Attorney, Jeffrey Clapper.  One witness testified and three exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

On December 9, 2017, near midnight Officer Jeff MacFarlane was on patrol in Sioux Falls, South Dakota, on behalf of the Sioux Falls Police Department.  A hysterical female placed a 911 call about a man in cardiac arrest.  Dispatch relayed alert tones over the police radio and then relayed the information and the man's address to Officer MacFarlane (among others).  Officer MacFarlane proceeded to the location. See Exh. 1.

The location was a twin home with the indicated address being on the east side of the structure.  Officer MacFarlane was the first official to arrive at the scene.  Officer MacFarlane went to the front door of the residence, which was ajar.  He stepped inside the home and did not see or hear anything.  He called out, "police department," and Shalene Ball appeared on a set of stairs going down to the basement.  The stairs were immediately adjacent to the door on the left.

2

Ms. Ball directed Officer MacFarlane to come downstairs.  In the lower level, Officer MacFarlane saw Mr. Kempf lying on the floor in the bathroom with the light on.  He was lying curled up on his left side, with his knees bent, and rolled forward partially on his chest or stomach.  He was clothed in jeans and a t-shirt.

Officer MacFarlane testified the followed events and observations occurred, but in rapid-fire fashion over a period of approximately 90 seconds.  Although he knew they occurred, he could not say with absolute certainty the order in which they occurred or if they occurred simultaneously.  He was questioning Ms. Ball what had happened, what had she seen, what was going on, if Mr. Kempf took any prescription medications, if he had used drugs, and if he had a mental illness.  Officer MacFarlane was questioning Mr. Kempf if he was okay, what hurt, and whether he could hear Officer MacFarlane.  Mr. Kempf was not responding.

Officer MacFarlane could see no blood and no evidence of trauma.  He checked Mr. Kempf's breathing and verified he was breathing faintly, though in a gargled fashion as though his tongue was in the way.  Officer MacFarlane felt for a pulse in Mr. Kempf's neck and found a strong pulse.  Officer MacFarlane tried to position Mr. Kempf into a "rescue position," which makes breathing easier.  This consisted of keeping Mr. Kempf on his left side, but more perpendicular to the floor instead of rolled forward, his left arm under and supporting his head, his right arm parallel to his body on top, his left leg straight on the floor and in line with his body, and his right knee drawn up

3

toward the chest and resting on the floor.  Officer MacFarlane testified it was difficult to move Mr. Kempf's limbs as they were stiff similar to rigor mortis.

While all of this was going on, Ms. Ball told Officer MacFarlane that Mr. Kempf was having a diabetic attack, that he was a diabetic and took insulin.  Officer MacFarlane asked Ms. Ball where he kept his diabetic kit.  Ms. Ball responded in his coat.  Officer MacFarlane looked around for a coat, but never searched in any coat.  Officer MacFarlane asked if there was anywhere else Mr. Kempf kept his medicines.

There was a black bag about waist-high on a wooden shelf in the bathroom between the toilet and the vanity.  See Exh. 2.  Officer MacFarlane's attention was drawn to this bag as a possible location of Mr. Kempf's medicines because of conversation he had with Ms. Ball.  Officer MacFarlane could not recall the exact words or nature of that conversation, only that the conversation with Ms. Ball led him to consider the bag as a source of medication.  Officer MacFarlane testified it was a black leather-looking bag that looked like the type of hygiene kit a man would use to transport his toiletries in when going on an overnight stay.  Officer MacFarlane testified he clearly understood from what Ms. Ball told him that the bag belonged to Mr. Kempf.

Officer MacFarlane testified he had responded to a couple previous 911 calls that did involve a diabetic event.  The symptoms he observed on those prior occasions did not match what he observed with Mr. Kempf.  Also, he believed insulin was injected into muscle, not into a vein.  However, he

4

explained he did not have medical expertise and he could not rule out the possibility that Mr. Kempf was having a diabetic episode.

While Officer MacFarlane was in the bathroom with Mr. Kempf, Ms. Ball remained outside the bathroom near the doorway looking in. At some point, Officer MacFarlane observed a syringe with a dark brownish-red substance in it on the floor of the bathroom (between the toilet and vanity) and a belt in the shape of a tourniquet near Mr. Kempf somewhere. Officer MacFarlane thought the substance in the syringe might be heroin or dried blood. As with his other recollections, Officer MacFarlane was unable to pinpoint exactly when in the sequence of events he observed these items, just that he did observe them.

When medical personnel arrived on scene, they came to the basement with a backboard. At this point, Officer MacFarlane assisted other personnel in removing Mr. Kempf from the bathroom and placing him on a backboard. Officer MacFarlane testified he never left Mr. Kempf's side once he had arrived in the basement bathroom until the medical personnel came along and relieved him. During the time period before medical personnel arrived, Officer MacFarlane looked around his surroundings with his eyes, but did not physically do any searching. He stayed by Mr. Kempf's side.

After helping medical personnel get Mr. Kempf secured to a back board, Officer MacFarlane went back into the bathroom and lifted the lid on the black bag. There was no padlock or other device locking the bag shut. The bag closed with a simple clasp. Officer MacFarlane could not remember if the clasp was closed or not. He looked into the bag to see if Mr. Kempf's diabetic kit was

5

inside or if there was other evidence, including narcotics, that would shed light on Mr. Kempf's medical condition.  He testified his goal was to gather as much information as possible to assist the paramedics in responding to Mr. Kempf's medical condition.

Inside the bag, Officer MacFarlane observed a silver spoon, a small cotton ball about the size of a pencil eraser that was dirty as though it had mud on it, and a clear plastic rectangular box containing .22 caliber ammunition.  After seeing the contents of the bag—especially the spoon and cotton ball—along with the syringe and belt, Officer MacFarlane thought that some type of opioid ingestion might be causing Mr. Kempf's symptoms.  Again, however, he testified he did not have medical expertise.  He did not want to jump to the conclusion Mr. Kempf was suffering an opioid overdose and fail to continue investigating.

At some point, Officer MacFarlane went to the ambulance to which Mr. Kempf had been removed and inquired whether medical personnel had administered Narcan, an antidote to opioid overdose.

Sergeant Smedsrud, Officer MacFarlane's supervisor, arrived on scene sometime after Officer MacFarlane.  Officer MacFarlane spoke to him and told him he had observed the syringe and the contents of the black bag.  Officer MacFarlane suggested Sergeant Smedsrud may wish to obtain a search warrant.

Instead, Sergeant Smedsrud spoke to Phyllis Nelson and Ms. Ball. Ms. Nelson was the owner and resident of the twin home and Ms. Ball was the

6

resident in the basement living quarters.  Mr. Kempf was an occasional overnight visitor of Ms. Ball's in the basement living quarters.  Sergeant Smedsrud asked both Ms. Nelson and Ms. Ball for consent to search the basement.  Officer MacFarlane interjected and told Ms. Nelson she could follow the officers as they searched, that she could tell them to stop at any time, and that she could limit the search to certain areas.  Both women consented to the search.

After the two women gave consent, Officer MacFarlane re-entered the basement bathroom and took only the black bag, the syringe and the belt.  He did not search anywhere else and he did not seize any other items.  After seizing the bag, Officer MacFarlane conducted a subsequent and more thorough search of it which uncovered a .22 caliber handgun which is the subject of Mr. Kempf's charge before this court.

After these events concluded, Officer MacFarlane wrote a report summarizing what happened.  He testified the report represents his synthesis of all the information he discovered, written with the benefit of hindsight.  It did not necessarily represent his contemporaneous thought processes as events unfolded minute by minute.

Mr. Kempf moves to suppress the evidence obtained from the black bag.  He argues Officer MacFarlane exceeded the scope of the community caretaker exception to the warrant requirement when looking in the bag initially.  He also argues the consent to search given by Ms. Nelson and Ms. Ball was invalid because all were aware the bag belonged to Mr. Kempf, not to either of the

women.  The government relies on the community caretaker exception and the plain view exception to support the legality of Officer MacFarlane's actions.

## DISCUSSION

**A.    Community Caretaker Exception to the Warrant Requirement**

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.  Maryland v. Buie, 494 U.S. 325, 331 (1990).  In determining the reasonableness of a search, courts are to balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Id.  A search of a home without a warrant supported by probable cause is usually unreasonable.  Id. "[N]o zone of privacy is more clearly defined than a person's home: '[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' " United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)).

There are, however, several exceptions to the warrant requirement "where the public interest is such that neither a warrant nor probable cause is required."  Buie, 494 U.S. at 331.  The burden is on the government to establish that an exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005); United States v. Weston, 443 F.3d 661, 668 (8th Cir. 2006).  The government argues Officer MacFarlane's entry into the Nelson

8

home and his examination of the contents of the black bag were justified by the community caretaker exception to the warrant requirement.

One of the exceptions to the warrant requirement is the community caretaker exception.  See Cady v. Dombrowski, 413 U.S. 433, 447-48 (1973). In Cady, the suspect had wrecked his car and it was on a public roadway.  Id. at 435-39.  The suspect was a Chicago police officer, who, the local Wisconsin police believed, was required to carry his service revolver on him at all times. Id.  The Wisconsin police, not finding a gun on the suspect's person or in the passenger area of the car, unlocked to trunk to see if the gun was there so as to prevent intrusion by vandals and possibly having a gun fall into the wrong hands.  Id.  What they found in the trunk was evidence the suspect had committed an assault or, as ultimately turned out to be the case, a murder.  Id.

The Court held the search of the trunk, conducted out of concern for the safety of the public who might be endangered should a gun be left unattended in the trunk, was reasonable under the Fourth Amendment.  Id. at 448.  The Court characterized the community caretaking function of police as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Id. at 441.

In Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012), the court discussed both the community caretaker exception and the emergency aid exception to the warrant requirement in the context of a civil claim pursuant to 42 U.S.C. § 1983.  The emergency aid exception allowed police to make a warrantless entry into a home if they have "an objectively reasonable basis for

believing an occupant is . . . imminently threatened with [serious injury]." Id.
at 371 (quoting Ryburn v. Huff, 565 U.S. 469, 474 (2012)).  "The need to
protect or preserve life or avoid serious injury is justification for what would
otherwise be illegal absent an exigency or emergency."  Ryburn, 565 U.S. at
474 (quoting Brigham City v. Stuart, 547 U.S. 398, 400 (2006)).  The Court has
characterized as "silly" the idea that "police would commit a tort by entering" a
residence to save a life.  Georgia v. Randolph, 547 U.S. 103, 118 (2006).

The similar community caretaker exception allows police to enter a home
without a warrant if "the officer has a reasonable belief that an emergency
exists requiring his . . . attention."  Burke, 677 F.3d at 371 (quoting United
States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006)).  "Reasonable belief"
requires less of a showing than the probable cause standard does.  Id.
Instead, police must have specific articulable facts and the governmental
interest in the community caretaking function must outweigh "the individual's
interest in being free from arbitrary government interference."  United States v.
Harris, 747 F.3d 1013, 1017 (8th Cir. 2014) (quoting Samuelson v. City of New
Ulm, 455 F.3d 871, 877 (8th Cir. 2006)).  The test is an objective one, and does
not depend on the officer's subjective motivations.  Michigan v. Fisher, 558
U.S. 45, 47 (2009) (per curiam).

Once an officer makes a warrantless entry pursuant to the community
caretaker exception, the "scope of the encounter must be carefully tailored to
satisfy the purpose of the initial [incursion]. . ."  Harris, 747 F.3d at 1017.  The
Harris court classified the emergency aid exception as a subcategory of the

10

community caretaker exception.  Id. (citing Burke and stating that "[o]ne situation in which an officer may act under the community caretaker exception is when 'the officer has a reasonable belief that an emergency exists requiring his or her attention.' ").  At bedrock, the community caretaking exception applies when police are "help[ing] those in danger."  United States v. Smith, 820 F.3d 356, 360 (8th Cir. 2016).

The court has little difficulty concluding that Officer MacFarlane's entry into the basement of the house was justified under the community caretaking and/or emergency exception.  A 911 call was made by a hysterical Ms. Ball.  She reported Mr. Kempf was having a cardiac arrest.  Officer MacFarlane entered the home because Mr. Kempf was in danger and the officer was rendering assistance.

Likewise, the court has little difficulty concluding the same rationale supports Officer MacFarlane's search of the black bag.  Ms. Ball's explanation for Mr. Kempf's condition was that Mr. Kempf was a diabetic.  She pointed Officer MacFarlane to the black bag as Mr. Kempf's kit, a possible location for his diabetic supplies.  When Officer MacFarlane looked into the black bag, it was with the primary purpose of rendering assistance to Mr. Kempf, which fits squarely within the community caretaker/emergency assistance exception.

This is true even if Officer MacFarlane did not believe Mr. Kempf was suffering from a diabetic attack.  This is true even though medical personnel had, by this point, taken over the task of providing primary medical care to Mr. Kempf.

This is true even if, at the time he lifted the lid to the black bag, Officer MacFarlane suspected Mr. Kempf's condition was caused by the ingestion of drugs.  Rendering speedy and appropriate medical care to Mr. Kempf would be aided by knowing what actually was causing his symptoms.  Narcan is a proper treatment for opiod overdose, but it may not be indicated if one had overdosed on methamphetamine, barbiturates, ecstasy, mushrooms or any of a number of other substances.  Officer MacFarlane had an objectively reasonable basis for believing that looking into Mr. Kempf's black bag may lead to information that would assist first responders in addressing his medical emergency.

The court is guided by an objective test, not by trying to discern Officer MacFarlane's subjective motivations.  Brigham City, 547 U.S. at 404-05. Assuming one could "neatly unravel" in the hubbub of events that unfolded on the night in question in so compressed a period of time, what Officer MacFarlane's subjective motivations were, those subjective motives are not the court's concern.  Id.  Here, it was reasonable to assume the community caretaking function would be furthered by checking the black bag for medications or some indication of what was causing Mr. Kempf's crisis.

Nor did Officer MacFarlane exceed the scope of the community caretaking exception.  This was not a wide-ranging search by the police that invaded the bread box in the kitchen, the shoebox in the back of the bedroom closet, or the television cabinet in the living room.  The item searched was within arm's reach of the man on the floor who had clearly been laid low by

something.  Searching within the immediate environs of Mr. Kempf was well within the scope of the community caretaking exception.

Once Officer MacFarlane saw the silver spoon and dirty cotton ball, another exception to the warrant requirement came into play:  the plain view exception.  The Court in Horton v. California, 496 U.S. 128, 135 (1990), explained that, because *any* evidence seized by the police will likely be in plain view, the plain-view doctrine may only be used to justify a warrantless seizure when the initial intrusion that brings the police within plain view of the items seized is supported by one of the recognized exceptions to the warrant requirement.  The plain-view doctrine does not stand alone, rather it works in conjunction with a prior justification for the lawful presence of the police at the place of the warrantless seizure.  Id. (citing Coolidge, 403 U.S. at 465-66).  That is, a police officer who comes across evidence while in hot pursuit of a fleeing suspect, while validly arresting a defendant, or while executing a valid search warrant for other objects may rely on the plain view doctrine to seize items in plain view that are not covered by a warrant.  Id. at 135-36 (citing Coolidge, 403 U.S. at 465-66).  Finally, if a police officer has some legitimate reason for being present that is *unconnected* with a search directed against the defendant, that is, an officer is not searching for evidence against the accused, then any incriminating objects in plain view may be seized without a warrant.  Id. at 135.

Here, Officer MacFarlane was lawfully in the location where he viewed the contents of the black bag due to the application of the community

caretaker/emergency aid exception.  From that legal vantage point, he saw the drug paraphernalia and the ammunition.  Thus, the plain view exception applies.

The facts of this case are similar to those in United States v. Cunningham, 133 F.3d 1070 (8th Cir. 1998).  In Cunningham, a woman named Lachonda called 911 and reported she was being held in an apartment against her will.  Id. at 1071.  When police arrived, Jerry met them at the door and attempted to prevent them from entering.  Id.  Jerry was arrested for obstructing justice.  Id.  Police then entered the apartment.  Id.

Inside, they found Lachanda holding a young child, imprisoned by Sheila, who sat on a chair on top of Lachonda.  Id.  Police freed Lachonda and then interviewed her in a rear bedroom where she told them about Jerry's drug dealing and possession of guns.  Id.  Police observed rolling papers and currency in the rear bedroom.  Id.

Lachonda said she heard Sheila tell Jerry she had moved the guns and drugs out of the apartment and into her vehicle.  Id.  Lachonda identified the vehicle and police impounded and towed it.  Id.  Police later obtained a search warrant and found contraband, charging Jerry with drugs and weapons offenses.  Id.  Jerry argued that police violated his Fourth Amendment rights by entering all of the rooms of the apartment—he argued police should have stopped when they encountered Lachonda and arrested him.  Id. at 1072.

The court disagreed, allowing the warrantless entry based on the 911 call and the emergency aid exception.  Id.  The officers' entry into the home was

14

based on a reasonable belief someone's safety was threatened.  Id.  Once inside, the officers had a right to sweep the premises to ensure there were no other persons who posed a danger to those at the arrest scene, including Lachonda and the officers.  Id. at 1072-73.  Because the officers had a legitimate reason to be in the location where they observed the rolling papers and the currency, that evidence fell within the plain view exception.  Id. at 1073.

Like the police in Cunningham, Officer MacFarlane's entry into the home where Mr. Kempf was unconscious was supported by the 911 call made by Ms. Ball and the community caretaker/emergency aid exception to the warrant requirement.  Officer MacFarlane's look into the black bag was supported by the same emergency aid exception.  Finally, because Officer MacFarlane's location at the time he viewed the contents of the bag was from a legal vantage point, the ammunition falls within the plain view doctrine.  The court recommends denying Mr. Kempf's motion to suppress the evidence in the bag pursuant to the community caretaker/emergency aid exception and the plain view exception.

**B.    Consent to Search by Nelson and Ball**

Another exception to the warrant requirement is consent to search by one with actual or apparent authority to give consent to search the premises. The government asserts it had valid consent to search the basement from the

owner of the residence, Phyllis Nelson, and from Shalene Ball, the resident in the basement of the residence.[2]

The Supreme Court has held that when the government attempts to justify a warrantless search by asserting voluntary consent from a third party, the government must show that the third party had common authority over the premises or effects sought to be searched or a sufficient relationship to said premises or effects. United States v. Matlock, 415 U.S. 164, 171 (1974). In explanation, the Court stated that common authority over property rests not with a legal interest in the property, but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7.

In deciding whether a third party had authority to give consent to search, the officer "must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent." Weston, 443 F.3d at 668 (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United

---

[2] The government does not challenge Mr. Kempf's standing to challenge the search. The record reflects Mr. Kempf was an occasional overnight guest of Ms. Ball's. Overnight guests in a residence may have a reasonable expectation of privacy sufficient to confer standing under the Fourth Amendment. Minnesota v. Carter, 525 U.S. 83, 89 (1998); Minnesota v. Olson, 495 U.S. 91, 98-99 (1990). Because the government does not assert Mr. Kempf lacks standing, the court assumes—without so holding—that he has standing for purposes of the present motion.

States v. Pennington, 287 F.3d 739, 746-747 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and the owner, but how that relationship appears to the officer who asked for consent.")).  This standard is an objective one: "would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?"  Rodriquez, 497 U.S. at 189 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).  That Fourth Amendment analysis does not depend on common law property theories like apparent authority was made even more clear in the subsequent case of Matlock, in which the Court stated that, "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rather rests on mutual use of the property by persons generally having joint access or control for most purposes."  Matlock, 415 U.S. at 171 n.7 (citing Stoner, 376 U.S. 483).

In Frazier v. Cupp, 394 U.S. 731, 740 (1969), the Court found that the defendant's cousin had the authority to consent to a search of a duffle bag that both the defendant and the cousin shared and that the defendant had left at his cousin's house.

In United States v. Nichols, 574 F.3d 633, 635 (8th Cir. 2009), the defendant owned a home, and his girlfriend and her daughter lived with him, but the girlfriend had no legal property interest in the dwelling.  The girlfriend found a disk with pornographic pictures of her daughter on it and turned it over to the police.  Id.  The girlfriend had unrestricted joint access to the entire

residence, including the computer and the computer disk searched by the police.  Id. at 635-36.  She slept there, kept her possessions there, paid for the upkeep of the house, and freely occupied the house as a possessor.  Id.  The Eighth Circuit, relying on United States v. Matlock, 415 U.S. 164, 171 n.7 (1974), rejected Nichols' argument that the girlfriend had no authority to consent because she lacked a legal property interest in the realty.  Id.  In the alternative, the Eighth Circuit held that, even if the girlfriend lacked common authority over the house, the police reasonably believed that she had common authority.  Id.

Under the above law, it is clear that the owner of the residence (Ms. Nelson) and the primary renter of the residence (Ms. Ball) had the authority to consent to a search of the basement of the house.  Alternatively, the police reasonably believed the two women had common authority over the basement of the residence such that they could give valid consent to search. The court finds the secondary search to be valid under the consent exception to the warrant requirement.

Mr. Kempf seeks to avoid this conclusion by focusing on who had common authority over *the bag*, rather than who had common authority over the basement.  Mr. Kempf argues Officer MacFarlane did not reasonably believe the bag belonged to either Ms. Nelson or Ms. Ball and, thus, that consent by these two women was insufficient to allow officers to search the bag. The relevant question here is "what would the typical reasonable person have understood by the exchange between the officer and [Ms. Nelson and

18

Ms. Ball]?"   Florida v. Jimeno, 500 U.S. 248, 251 (1991).  In other words, given the exchange which had occurred between the officer and the landlord and tenant before the consent was given, was it reasonable for Officer MacFarlane to understand he had permission to search Mr. Kempf's bag?

When a host gives consent to search and a third-party guest is or has been at the house, a number of factors are evaluated in determining whether the host had apparent authority to grant consent to search the guest's property.  One important factor is whether the incriminating evidence was found in a common area used by both the guest and the host, or whether the evidence was found in a special area reserved to the guest's use.  In Burge v. United States, 342 F.2d 408, 410-11, 413 (9th Cir. 1965), a tenant of an apartment where Burge was a guest gave police consent to search the apartment.  Evidence of narcotics use was discovered and seized from the sole bathroom in the apartment, an area of common use by both the guest and host.  Id.  The court assumed the guest had standing to object to the search, but nevertheless sustained the search based on the host's consent.  Id. at 413-14.

In United States v. Wright, 971 F.2d 176, 179 (8th Cir. 1992), a host gave permission to search his home, including the bedroom where the guest had been staying.  Upon entering the guest bedroom, officers saw the guest's duffle bag with an incriminating airline ticket protruding from the top of the bag.  Id.  The court held the host's consent was a valid basis to allow police to enter the apartment, including the guest bedroom.  Id. at 180.  The court

declined to address whether the host's consent extended to the inside of the
guest's duffle bag because the airline ticket was in plain view without police
having to open the bag.  Id. at 180.

Another factor is whether the guest took any steps to communicate or
demonstrate that he did not want anyone to access the property.  For example,
where a suspect left computer discs in the care of a friend in a sealed envelope
with a warning against opening the discs, and where the discs could only be
opened using a sophisticated computer system that only a person with
advanced training could operate, the court held the suspect demonstrated an
intent that the discs remain private.  United States v. James, 353 F.3d 606,
614-15, 617 (8th Cir. 2003).  The James court held the friend's alleged consent
to search the computer discs was ineffective and police violated James' Fourth
Amendment rights by searching the discs without a warrant.  Id.

In United States v. Martinez, 450 F.2d 864, 865 (8th Cir. 1971), the
defendant stored boxes in a friend's garage which the friend also used for
parking and storage.  Martinez offered to rent the space, but the friend
demurred.  Id.  Martinez then supplied a combination lock to be placed on the
garage door.  Id.  Because both Martinez and the friend had access to and used
the garage, despite Martinez's efforts to express an expectation of privacy, the
court held the friend's consent to search Martinez's boxes was valid.  Id.
at 866.

In both Martinez and Wright, the court approved consent given by a legal
possessor of the premises to search a container (duffle bag or boxes) which

20

belonged to a guest.  Those cases determine the result herein.  Although police knew or had been told the bag belonged to Mr. Kempf, the consent given to search by Ms. Nelson and Ms. Ball was nevertheless valid.  There was no evidence that Mr. Kempf took any steps to broadcast to others an expectation of privacy in the bag.  Unlike <u>James</u>, there was no written message on the bag advising others to keep out.  There was no lock.  The bag itself was not hidden inside a closet or behind another object.  Furthermore, as in <u>Burge</u>, the bag was in a common area of the apartment (the bathroom), rather than in an area reserved exclusively for Mr. Kempf's use while he was a guest.  Applying the totality of the circumstances, the court concludes the consent given by Ms. Nelson and Ms. Ball encompassed Mr. Kempf's bag.  <u>See also</u> <u>United States v. Nowak</u>, 2015 WL 1268307 at ** 9-11 (D.S.D. Jan. 9, 2015) (finding apparent authority to consent to a search of Nowak's backpack by driver of automobile where both police and the driver knew the backpack belonged to Nowak but Nowak had left the backpack in the driver's car when he fled from police).

## CONCLUSION

Based on the foregoing facts, law and analysis, this magistrate judge respectfully recommends that defendant Chester Kempf's motion to suppress [Docket No. 27] be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely

objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 30, 2018.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge