UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CHESTER LEE KEMPF,<br><br>Defendant. | 4:18-CR-40067-KES<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AS MODIFIED AND DENYING MOTION TO SUPPRESS |

Defendant, Chester Lee Kempf, is charged with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2), and one count of possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d), 5845(a), and 5871. Docket 2. Kempf moves to suppress evidence. Docket 27. The court referred Kempf's motion to Magistrate Judge Veronica Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended that the court deny Kempf's motion to suppress. Docket 32. Kempf now objects. Docket 35. After a de novo review of the Report and Recommendation and a review of the record, the court adopts the Report and Recommendation as modified below and denies Kempf's motion.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil

Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1)(A); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

Kempf does not object to the magistrate judge's statement of facts. A full recitation of the facts can be found in the Report and Recommendation (Docket 32), but after a de novo review of the evidence, the court finds the pertinent facts relevant to Kempf's objections are as follows:

On December 9, 2017, Officer MacFarlane, a Sioux Falls Police officer, was on patrol when he responded to a 911 call for a man in cardiac arrest at a residence. Officer MacFarlane was the first official to arrive at the scene, and he saw that the front door to the residence was open. He yelled "police department" while stepping inside the front door of the residence. A female, Shalene Ball, came up the stairs from the basement and directed Officer MacFarlane to go to the basement, saying, "He's down here." Docket 33 at 9:8-10. When he arrived downstairs, Officer MacFarlane saw Kempf lying on his left

side on the bathroom floor. Officer MacFarlane checked Kempf's breathing, which was faint and sounded "gargled," but his pulse on his neck was strong. *Id.* at 10:21-24. Officer MacFarlane rolled Kempf to the rescue position to help open Kempf's airway.

During this initial response to Kempf lying on the floor, Officer MacFarlane simultaneously questioned Ball, who was standing in the bathroom doorway, about what happened. He also attempted to ask Kempf questions about his condition, but Kempf did not respond. Ball told Officer MacFarlane that Kempf was diabetic and he was taking insulin. In response, Officer MacFarlane testified that:

> A. I asked her where he kept his medications at.
>
> Q. What did she tell you?
>
> A. "In his coat." "In his coat," I believe is what she said.
>
> Q. Did you ask her anything else after that then, after she responded, "The kit is in his coat"?
>
> A. I asked her, "Does he keep his medications anywhere else?" We had a conversation about where he keeps his other medications.
>
> Q. What did she say or do then?
>
> A. Our conversations led us to a black bag that was on a wooden shelf [in the bathroom], about waist height, with maybe three or four shelves.
>
> . . . .
>
> Q. Okay. So the black bag, what made you decide to look in there?
>
> A. Conversation between me and Shalene. I'm not sure if I asked her if he keeps his meds in there, or if, while I'm asking her about where else he keeps his meds, she directed me to it. If it was like, "Sometimes he keeps his meds in there." Or if I asked, "What about this bag? Is this bag his?" Or "what about this bag? Does he keep meds in here?"

*Id.* at 16:11-17:10.

Officer MacFarlane remembers seeing a black leather coat in the bathroom, but he did not search through any coat for Kempf's diabetes kit. Paramedics and the fire department arrived at the residence, and someone brought a backboard into the residence bathroom. After officials loaded Kempf on to the backboard and began transporting him upstairs, Officer MacFarlane saw a syringe filled with a dark-brown substance that looked like dried blood on the bathroom floor and searched for possible prescription medications. He also saw a belt formed into a tourniquet on the bathroom floor. Knowing that insulin is injected into muscle rather than a vein, Officer MacFarlane testified that, based on his experience, he suspected drugs could have caused Kempf's condition.

Officer MacFarlane then opened the black bag, which looked like a men's hygiene bag from the outside, in which he saw a silver spoon, a small cotton ball darkened in color, and a plastic holder box of .22 caliber ammunition. Ball told Officer MacFarlane that the black bag belonged to Kempf. He believed it all to be drug paraphernalia, but also looked inside the bag for prescriptions or other explanations for Kempf's medical episode. He was "trying to find the root cause" of Kempf's medical condition. Docket 33 at 22:19-21. Based on his experience responding to other diabetic attacks, Officer MacFarlane testified that Kempf's medical condition was "outside the norm" and what he saw in the bathroom made him believe Kempf was not having a diabetic attack. *Id.* at 23:7-15. He suspected Kempf's condition was possibly caused by an opioid

4

overdose so he walked to the paramedics in the driveway and suggested they give him Narcan.

Phyllis Nelson owned the residence and lived there. Shalene Ball lived in the basement of the residence. Kempf was an occasional overnight guest in the residence, but he did not live there. Officer MacFarlane discussed seeking a warrant with Sergeant Smedsrud, who arrived on scene sometime after Kempf was in the paramedics' care. But instead of obtaining a warrant, Sergeant Smedsrud requested consent to search the residence from both Nelson and Ball. Both consented.

Nelson and Ball also both consented to Officer MacFarlane seizing Kempf's black bag that was still in the downstairs bathroom. Upon returning to his patrol vehicle, Officer MacFarlane again searched the black bag without a warrant, at which point he found a .22 caliber handgun inside. Officer MacFarlane then returned to the law enforcement center, where he again searched Kempf's black bag. During this third search, he found an oil filter with a hole in it.

## DISCUSSION

The Fourth Amendment generally requires that law enforcement officers secure a warrant before conducting a search of a person's property. *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Smith v. Ohio*, 494 U.S. 541, 542 (1990). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotations omitted). But the warrant requirement is subject to certain

5

reasonable exceptions. *Id.* "The government bears the burden of establishing that an exception to the warrant requirement applies." *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971)).

Kempf objects to the magistrate judge's recommendation that the community caretaker exception applies to the search of Kempf's bag. Docket 35 at 2. Kempf also objects to the magistrate judge's recommendation that the plain view doctrine justified the warrantless seizure and two subsequent warrantless searches of Kempf's bag. *Id.* at 6. Finally, Kempf objects to the magistrate judge's recommendation that the consent exception to the warrant requirement applies to the search of Kempf's bag. *Id.* at 8. The court will address each legal objection in turn.

I.  **Community Caretaker Exception**

One exception to the warrant requirement is known as the community caretaker exception, which the United States Supreme Court has described as:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The Eighth Circuit has extended the application of the community caretaker exception to an officer's warrantless entry into a person's home when that officer "has a reasonable belief that an emergency exists requiring his or her attention." *United States v.*

6

*Quezada*, 448 F.3d 1005, 1007 (8th Cir 2006) (citations omitted); *see also Mincey v. Arizona*, 437 U.S. 385, 391 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."); *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (noting that the Eighth Circuit "has recognized that such a community caretaker classification may justify noninvestigatory searches and seizures in certain limited situations." (internal quotation omitted)). The Supreme Court has concluded that reasonable belief "is a less exacting standard than probable cause." *Quezada*, 448 F.3d at 1007 (citing *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)).

"The emergency aid and community caretaker exceptions are similar in nature, but not identical." *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012) (footnote omitted). Under the emergency aid exception, an officer may enter a residence without a warrant if the officer has "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 400. The officer's subjective intent is irrelevant "as long as the circumstances, viewed objectively, justify [the] action." *Id.* at 404 (alteration in original) (quotation omitted); *see also id.* at 405 ("It therefore does not matter here-even if their subjective motives could be so neatly unraveled-whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence.").

Kempf concedes that Officer McFarlane's entry into the home fell within the scope of the community caretaker exception. Docket 35 at 4. But Kempf objects to the magistrate judge's recommendation that the community caretaker exception applies to Officer McFarlane's search of Kempf's bag, arguing that Eighth Circuit precedent does not support extending the community caretaker exception to the warrantless "search of a person's personal effects in a home, particularly a closed container . . . ." Docket 35 at 4-5. Kempf does not address the magistrate judge's analysis regarding the emergency aid exception.

"Ordinarily, a warrant is necessary before police may open a closed container because by concealing the contents from plain view, the possessor creates a reasonable expectation of privacy." *United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008). In the context of the community caretaker exception, the Eighth Circuit has stated that a "search or seizure under the community caretaking function is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government intrusion." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (citing *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014)).

The court, like Kempf, is not aware of any case explicitly holding that the community caretaker exception applies to a warrantless search of a closed container or personal effect found within a residence. But Eighth Circuit precedent about the community caretaker exception consistently assesses an

officer's response to an emergency under a reasonableness standard. *See Harris*, 747 F.3d at 1019 ("Our inquiry in this case is guided by the Fourth Amendment's central requirement, reasonableness."). Thus, the court examines whether Officer MacFarlane had a reasonable belief that searching inside Kempf's bag would aid in his response to Kempf's medical emergency.

Based on the Eighth Circuit's reasoning in *Harris*, *Smith*, and *Quezada*, the court finds that Officer MacFarlane's noninvestigatory search of Kempf's black bag while quickly looking for signs of what caused Kempf's medical emergency was reasonable under the circumstances. *See Smith*, 820 F.3d at 360-61 (discussing the "specific, articulable facts known to the officers" during their community caretaker response); *Harris*, 747 F.3d at 1018-19 (concluding that the officers' actions in response to an emergency were reasonable and outweighed the individual's right to be free from government intrusion); *Quezada*, 448 F.3d at 1008 (finding that an officer's warrantless entry into a home was reasonable under the community caretaker exception when the officer saw lights on and a television playing but received no response after yelling several times). Kempf was lying unresponsive on the bathroom floor and Ms. Ball told Officer MacFarlane that Kempf was diabetic. While Officer MacFarlane's testimony is somewhat inconsistent about when he decided to look in Kempf's bag, his entire response to Kempf's medical episode happened very quickly.

Officer MacFarlane's actions were reasonable because Officer MacFarlane opened Kempf's bag to find some explanation of Kempf's medical condition and

to provide emergency aid to Kempf. Even though Officer MacFarlane testified that he did not look in Kempf's bag until after the paramedics already began transporting Kempf to the ambulance, Officer MacFarlane was still responding to Kempf's medical emergency when he opened the bag. After observing the syringe on the floor, the belt looped into a tourniquet, and the used cotton ball and silver spoon in the bag, Officer MacFarlane followed the paramedics outside and asked if they had administered Narcan yet, thus showing that he was still engaged in a community caretaking function.

Officer MacFarlane's search also did not exceed the scope of his role as a community caretaker. *See Smith*, 820 F.3d at 362 (stating that the scope of an officer's encounter under the community caretaker exception "was carefully tailored to satisfy the purpose."). He did not rummage through multiple drawers and cabinets, did not wait an extended period of time before opening Kempf's bag, and did not search for possible explanations of Kempf's medical emergency anywhere outside the bathroom where Kempf was lying unresponsive. Thus, the court concludes that it is appropriate to apply the community caretaker exception to Officer MacFarlane's limited search of Kempf's bag under the circumstances here. Kempf's objection to the magistrate judge's recommendation is overruled.

## II. Plain View Doctrine

The plain view doctrine allows an officer to seize, without a warrant, an item (1) that is in plain view, (2) while observed from a lawful vantage point, and (3) its incriminating character is immediately apparent. *United States v.*

10

*Banks*, 514 F.3d 769, 773 (8th Cir. 2008) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)).

The magistrate judge discussed the plain view doctrine's application to the items Officer MacFarlane observed inside the black bag during his initial search of the bag, including the silver spoon, used cotton ball, and a plastic holder box of .22 caliber ammunition. Because Kempf has not objected to the magistrate judge's conclusion that the plain view doctrine applies to the items found within the black bag during this first search, the magistrate judge's recommendation on that point (*see* Docket 32 at 13-15) is adopted.

Kempf does object, however, to the application of the plain view doctrine to justify "the warrantless seizure and two subsequent warrantless searches of Kempf's black bag." Docket 35 at 6. Kempf argues that after the situation stabilized and Kempf was in the paramedics' care, Officer MacFarlane told Sergeant Smedsrud what he observed in Kempf's black bag, and suggested they obtain a warrant. But instead of obtaining a warrant, Sergeant Smedsrud obtained consent to search from Nelson, the owner of the residence, and Ball, the tenant living in the basement.

It does not appear that the magistrate judge relied on the plain view doctrine when she recommended denying Kempf's motion to suppress the evidence obtained after Officer MacFarlane seized Kempf's black bag and subsequently searched it a second and third time. Rather, the magistrate judge concluded that it was reasonable for Officer MacFarlane to seize the bag and search it a second and third time under the consent doctrine. And Officer

MacFarlane testified that he seized Kempf's bag based on Nelson and Ball's consent. Thus, the court will address Kempf's objections to the warrantless seizure of Kempf's bag and the two subsequent warrantless searches of the bag under the consent doctrine.

**III. Consent Exception**

The magistrate judge concluded that Nelson, the owner of the residence, and Ball, the basement tenant, had authority to consent to the officers' search of the basement of the house, and alternatively concluded that the officers reasonably believed Nelson and Ball had common authority over the basement to consent to the search. Docket 32 at 18. Based on case law, the magistrate judge concluded that Nelson and Ball's consent to search the residence validly encompassed the officer's search of Kempf's bag. *Id.* at 20-21. Kempf objects, arguing that it was not reasonable for the officers to rely on Nelson or Ball's consent to justify their warrantless seizure and searches of Kempf's bag. Docket 35 at 9-10. Thus, the court will assess the reasonableness of Officer MacFarlane's warrantless seizure and subsequent warrantless searches of Kempf's bag.

Under the consent doctrine, a person may voluntarily consent to an officer's warrantless search of an area over which the person has common authority. *United States v. Matlock*, 415 U.S. 164, 170 (1974). Even if a consenting individual did not have common authority over the premises to be searched, an officer's warrantless entry based on third party consent is still valid if, at the time of entry, the officer reasonably believed that the third party

possessed common authority over the premises. *United States v. Weston*, 443 F.3d 661, 668 (8th Cir. 2006). Common authority over premises or effects is "determined by the existence of mutual use, joint access, and control." *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009) (internal quotation omitted). The court must determine if "the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched." *Weston*, 443 F.3d at 668 (quotation omitted).

In *United States v. James*, the Eighth Circuit analyzed "under what circumstances" law enforcement officers had "a reasonable perception that a third person has the authority of the owner to allow officers to inspect the contents of a computer disc entrusted to him by the owner[.]" 353 F.3d 606, 610 (8th Cir. 2003). In *James*, law enforcement officials learned that Laschober was in possession of several CD discs owned by James, who was detained for allegations of sexual misconduct involving a child. *Id.* at 610-11. James wanted Laschober to destroy the discs. *Id.* at 611. Detectives then arrived at Laschober's home and questioned Laschober about his relationship with James and the discs in question. *Id.* The discs were inside a brown envelope and sealed with tape. *Id.* The detectives asked Laschober if they could open the envelope, and Laschober consented. *Id.* There were ten discs inside, and the top disc had a note that referred to a CD virus but also included words such as "confidential," "classified," "personal," and "private." *Id.* Laschober then consented to the detectives taking the discs with them. *Id.* The detectives then

13

attempted to view the discs back at the law enforcement center, and they eventually found images of child pornography. *Id.* Law enforcement never obtained a warrant to seize or search the discs. *Id.*

James moved to suppress the evidence obtained as a result of the warrantless search and seizure, which the district court granted. *Id.* at 613. The Eighth Circuit, however, reversed on all four grounds. *Id.* On the issue of common authority to consent to the search, the Eighth Circuit discussed Laschober's status as a bailee, noting that "physical access to the inner contents of the item . . . does not mean the bailee has actual authority to look at the contents of the items, or to consent to another's searching them." *Id.* at 614; *see also id.* (citing *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993)) ("A girlfriend does not give her boyfriend authority to consent to a search of her purse left in the trunk of a rental car by the mere fact of their relationship and her having left it in the car."). Thus, the Eighth Circuit concluded that James gave Laschober the discs to store them—not to exercise control over the discs or consent to a search of the discs. *Id.*

Looking at the facts available to the detectives at the time Laschober consented, the Eighth Circuit next addressed Laschober's apparent authority to consent. *Id.* at 615. Because the detectives knew the discs belonged to James and had learned of James's intent to have Laschober destroy the discs before they arrived at Laschober's home, the court held that the detectives could not reasonably believe Laschober had apparent authority to consent to their warrantless seizure and search of James's discs. *Id.*

In *Nichols*, in contrast, the Eighth Circuit noted that despite a third party's lack of property interest in the residence, the third party could still give consent to a search of the residence because she was a co-occupant of the residence. *Nichols*, 574 F.3d at 636. The third party "had unrestricted and joint access to the entire residence, including complete access to the computer and the computer disk that officers searched." *Id.* Moreover, the Eighth Circuit discussed how the third party validly consented to the search because police officers reasonably believed she had authority to consent. *Id.* at 636-37. *See also United States v. Beasley*, 688 F.3d 523, 529-30 (8th Cir. 2012) (concluding that an officer's warrantless seizure of defendant's property based on his mother's consent was reasonable when defendant was in custody, defendant's property was taken from his mother's home, and the officer had probable cause to suspect the items seized contained evidence of a crime); *United States v. Elam*, 441 F.3d 601, 603-04 (8th Cir. 2006) (finding that an officer reasonably relied on a third party's consent to search defendant's locked cabinet without asking who owned the cabinet because the cabinet was in a common closet, the third party retrieved a key to open the cabinet, and the defendant stood by silently without indicating he had a privacy interest in the cabinet); *United States v. Janis*, 387 F.3d 682, 686 (8th Cir. 2004) (concluding that it was reasonable for officers to rely on third party's consent to enter residence when third party invited officers inside, entered the home without knocking, and offered to show the officers where a gun was, and officers did not know of any limitations on third party's authority to consent).

Nelson, as the owner of the residence, and Ball, the tenant living in the basement, had actual authority to consent to the officers' search of the basement. Kempf argues that Nelson and Ball, however, did not have actual or apparent authority to consent to the officers' seizure and two subsequent searches of Kempf's bag. Officer MacFarlane had to determine whether Nelson and Ball's consent to search the basement reasonably included the bag on the bathroom floor.

Officer MacFarlane's seizure of Kempf's bag was reasonable based on the totality of circumstances. While involving the search of an automobile rather than a home, the Supreme Court has articulated Fourth Amendment principles related to the search of a closed container:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. . . . When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, . . . must give way to the interest in the prompt and efficient completion of the task at hand.

*United States v. Ross*, 456 U.S. 798, 820-21 (1982) (footnotes omitted).

Under this principle, Officer MacFarlane's search of the basement was lawful based on Nelson and Ball's consent. Thus, his search extended to closed containers within the basement and bathroom. Although Officer MacFarlane knew the bag belonged to Kempf, the consent to search the basement authorized the officers to seize any item that they believed was related to their

16

investigation. Kempf's bag was located in a common room, the bathroom, in someone else's home. The bag was closed, but not latched or locked shut. And there is nothing in the record to indicate that Ball did not have access to Kempf's bag, particularly in light of the fact that it was Ball who indicated to Officer MacFarlane that Kempf kept his insulin in the bag. Thus, it was reasonable for Officer MacFarlane to believe his search of the basement and bathroom encompassed the bag. Kempf's objection to the magistrate judge's recommendation regarding the seizure and two subsequent searches of his bag is overruled.

## CONCLUSION

Officer MacFarlane reasonably acted within his role as a community caretaker when he initially searched Kempf's bag during his response to Kempf's medical emergency. During this initial search, Officer MacFarlane observed the spoon, used cotton ball, and .22 caliber ammunition, which are admissible under the plain view doctrine. After Kempf was in the care of the paramedics and based on the consent to search given by Nelson and Ball, the owner and basement tenant of the residence, respectively, Officer MacFarlane seized Kempf's bag and searched it a second and third time. It was reasonable for Officer MacFarlane to seize and search the bag based on Nelson and Ball's consent because a valid search, here based on consent, generally encompasses closed containers within the area to be searched, and there was no indication that Ball did not have joint access to Kempf's bag. So the .22 caliber gun and oil filter are also admissible. Thus, it is

17

ORDERED that the report and recommendation (Docket 32) denying Kempf's motion to suppress is adopted as modified by this opinion.

Dated October 18, 2018.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE